# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### SOUTHERN DIVISION

NO. 7:19-CV-126-FL

| | | |
|---|---|---|
| KRISTIE PATE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| MEDICAL DIAGNOSTIC | ) | |
| LABORATORIES L.L.C. d/b/a/ Genesis, | ) | |
| | ) | |
| Defendant. | | |

This matter is before the court on defendant's motion for summary judgment (DE 39). The motion has been briefed fully, and the issues raised are ripe for ruling. For the following reasons, the motion is granted.

## STATEMENT OF THE CASE

Plaintiff commenced this action on July 9, 2019, by filing a verified complaint against defendant, her former employer, asserting claims disability discrimination, sex discrimination, retaliation, and wrongful discharge, under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12112 and 12117 ("ADA"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"); the Equal Pay Act of 1963, 29 U.S.C. § 206(1) ("Equal Pay Act"); and North Carolina law. Plaintiff seeks declaratory and injunctive relief; compensatory and punitive damages; and costs, fees, and interest.

Following defendant's answer and a period of discovery,[1] defendant filed the instant motion for summary judgment on August 14, 2020. In support of the motion, defendant relies upon a statement of facts and the following materials: 1) excerpts of plaintiff's deposition with exhibits thereto; 2) excerpts of the deposition of Michael Greco ("Greco"), plaintiff's former supervisor, with exhibits thereto; and 3) declarations of Valarie Tharnish ("Tharnish") and Jessica Hendrix ("Hendrix"), employees of defendant, with exhibits thereto.

Plaintiff responded in opposition on October 7, 2020, relying upon an opposing statement of material facts and the following materials: 1) plaintiff's verified complaint; 2) additional excerpts of depositions of plaintiff and Greco; 3) plaintiff's affidavit; 4) affidavit of Weston K. Williamson ("Williamson"), former employee of defendant; 5) exhibits to plaintiff's deposition and the Greco deposition, including: a) a map of plaintiff's sales territory; b) a "Sales Performance Improvement Plan" for plaintiff; c) email correspondence between defendant's employees; d) an email from plaintiff to her counsel; e) a Wikipedia entry regarding Hurricane Florence; and f) defendant's responses to plaintiff's interrogatories. Defendant replied in support of the instant motion on October 19, 2020.

## STATEMENT OF FACTS

The undisputed facts, and facts viewed in the light most favorable to plaintiff, may be summarized as follows. Defendant is a company that "serves primarily as a reference laboratory for Polymerase Chain Reaction (PCR) based testing to physicians, laboratories and hospitals worldwide." (Def's Stmt. (DE 39-1) ¶ 1).[2]

---

[1] By text order entered November 6, 2019, the court granted in part and denied in part a motion by defendant to dismiss part of plaintiff's claims, dismissing without prejudice part of plaintiff's claim under North Carolina law for wrongful termination in violation of the North Carolina Retaliatory Employment Discrimination Act, N.C. Gen. Stat. § 95-241 et seq.

[2] Pursuant to Local Rule 56.1(a)(2), the court cites to paragraphs in defendant's statement of facts, or portions of such paragraphs, where not "specifically controverted by a correspondingly numbered paragraph in the opposing

2

Plaintiff worked for defendant from February 26, 2018, until November 2, 2018, as a senior sales executive. (Id. ¶ 2). Plaintiff's immediate supervisor was Greco, who had the title of district sales manager. (Id. ¶ 3). Greco's supervisor was Hendrix, who had the title of sector manager. (Id.). Hendrix reported to Tharnish, who had the title of vice president of sales. (Id.).

Greco selected plaintiff for hire, over a male candidate that Hendrix preferred and believed was a better candidate. (Greco Dep. 23; Hendrix Decl. ¶ 4). At the time of hire, Greco told plaintiff that her "territory would be eastern North Carolina based out of Wilmington," including Fayetteville, New Bern, Jacksonville, Goldsboro, and Brunswick County. (Pl's Dep. 45-46).[3]

Plaintiff's base salary, like all senior sales executives, was $50,000.00. (Def's Stmt. (DE 39-1) ¶ 7). Plaintiff also was eligible to receive commissions, but she earned less than $100.00 in commissions throughout her entire tenure with defendant. (Id. ¶ 8).

Plaintiff engaged in initial training from March 4 to March 7, 2018. (Pl's Stmt. (DE 49) ¶ 9). After that period of initial training, plaintiff's training continued thereafter "via a 12-week webinar series conducted each Friday." (Def's Stmt. ¶ 11). Greco conducted one or two "ride-alongs" with plaintiff during the initial training process. (Pl's Stmt. ¶ 10).

On March 12, 2018, Greco sent to plaintiff an email noting that plaintiff had completed an initial phase of training, and setting forth her sales quota expectations as a senior sales executive

---

statement." Plaintiff "objects to" defendant's statement of facts on the basis that it is circumventing normal brief length requirements when combined with defendant's brief. The local rule, however, requires defendant to file a "separate statement" of facts, supported by specific citations, which may be cross-referenced in a memorandum in support of summary judgment. Local Rule 56.1(a). Therefore, plaintiff's objection to defendant's statement of facts is overruled.

[3]      Although plaintiff cites to page 47 of her deposition in her statement of facts, she does not provide page 47 of her deposition in appendix to the statement of facts. (Compare Pl's Stmt. (DE 49) ¶ 5 with Pl's App'x (DE 51-1 to 51-3).

3

commencing on April 1, 2018. (Def's Stmt. ¶ 14; Pl's Dep. Ex. 13 (DE 39-2 at 93);[4] Hendrix Decl. ¶ 10). These expectations included: 1) obtaining a minimum average of two new submitting accounts (also referenced as "submitting clients") per month, for a total of six new submitting accounts by the end of three months; and 2) obtaining a minimum average of 28 specimens each month, for a total of 168 specimens at the end of three months. (Id.).[5]

Expectations for a senior sales executive also included completing 8-12 calls to prospective clients per day and up to two in-person presentations with prospective clients or existing clients each week. (Id.). For tracking purposes, such presentations are also referenced as "lunches" or "breakfasts." (Id.). In his March 12, 2018, email to plaintiff, Greco also stated that "[i]n order to be eligible to attend [defendant's] corporate training in New Jersey, you must show consistent progress in each item" of expectations for senior sales executives. (Pl's Dep. Ex. 13 (DE 39-2 at 93)).

Defendant provides senior sales executives a one-month "ramp up" period after their date of hire, before their sales expectations begin. (Pl's Stmt. ¶ 17; Greco Dep. 276). The ramp up period is expected to allow new senior sales executives to "[g]et lunches, get meetings, . . . get in front of a provider . . . to try to get in the pipeline all the lunches and everything else, because the next month is when [defendant] start[s] counting expectations." (Greco Dep. 276). Defendant informed plaintiff in her sales training that it is "a four week to six week call cycle of calling on people, having a lunch to close . . . accounts." (Pl's Dep. 135). In addition, defendant informed

---

[4]      In citations to documents to the record, except for deposition transcripts, if there is a discrepancy between the internal page number and the number assigned by the court's electronic case filing system, the assigned number is cited.

[5]      Submitting accounts are those accounts that submitted specimens for testing, and they include both existing accounts and new accounts. (Hendrix Decl. ¶¶ 10 and 12). Specimens submitted are tests received from a submitting account, and they include specimens from both new and existing accounts. (Id.)

4

plaintiff that it would be defendant's expectation that "it could take up to a month to close an account after doing a lunch and after calling on that account prior to that lunch." (Id.).

In early April 2018, plaintiff learned that she had breast cancer, and she informed Greco and defendant on April 6, 2018, that she needed to take a leave of absence for a double mastectomy. (Def's Stmt. (DE 39-1) ¶ 19). Defendant granted plaintiff the medical leave requested, which was scheduled from May 3, 2018, until June 19, 2018. (Pl's Dep. 93; Pl's Verified Compl. ¶ 18).[6] Defendant also determined at that time to reset plaintiff's "start date of responsibility for meeting [her] sales [goals]" to June 1. (Pl's Dep. 106). This means, she would come back "as a new rep when brought back on," and start quota requirements again on July 1, 2018. (Greco Dep. 190).

In the month of April, plaintiff closed one account, meaning that she had given them supplies, but hadn't actually sent specimens in for testing. (Pl's Dep. 116). She had completed three lunches. (Id.). On the day plaintiff informed Greco of her breast cancer, he told her to cancel all her lunches that she had scheduled between that day and her return date, because plaintiff would not be able to make calls on them and close them. (Pl's Dep. 116-117). Plaintiff was not told to stop making calls. (Pl's Dep. 118).

On April 24, 2018, Greco accompanied plaintiff on a breakfast meeting. After the meeting, she stated to him "[y]ou know, sometimes it's hard to put one foot in front of the other and get through my day. I'm just ready for this to be over." (Pl's Dep. 227). Greco responded, "well, remember we're paying you eight to five, don't be cutting out early." (Id.). Plaintiff felt intimidated by this and felt "fearful to ask for any accommodation that [she] might find that [she] needed in the future, because [Greco's] already told [her she's] not going to get it." (Id.).

---

[6]     The court draws facts from plaintiff's verified complaint, where the allegations are based upon her personal knowledge. See Goodman v. Diggs, 986 F.3d 493, 498 (4th Cir. 2021) ("[A] verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge.").

During plaintiff's medical leave, from May 5, 2018, until June 19, 2018, plaintiff was unable to make sales calls, conduct meetings and lunches with potential clients, or follow up with clients whom she called on before her medical leave. (Verified Compl. ¶¶ 18, 21; Pl's Dep. 93). While she was out on leave, she continued to receive emails from defendant, some of which informed plaintiff "that the territories had gone to open territories." (Pl's Dep. 93). This was part of defendant's "company-wide movement toward open territories," which other managers had completed in their districts before Greco. (Hendrix Decl. ¶ 9). In Greco's district, which included North Carolina and southern Virginia, this meant that, where prior to the change each sales executive had an individual territory, after the change every sales representative could seek out accounts and business throughout North Carolina and southern Virginia. (Greco Dep. 26-28; Pate Dep. 93-95). This change "applied to all sales executives under [Greco's] area of responsibility." (Pate Dep. 95).

During this same time period of plaintiff's leave, between May 3 to June 19, 2018, defendant hired senior sales executives who lived in Fayetteville (Christina Sanchez ("Sanchez"), female); Greenville (Williamson, male); and Raleigh (name(s) not specified, male). (Pl's Dep. 96). These new sales executives freely could come into plaintiff's former territory and schedule lunches with medical offices in plaintiff's former territory, during the time plaintiff was out on leave. (Pl's Dep. 94).

Plaintiff returned from her leave of absence on June 19, 2018, with no restrictions. (Pl's Dep. 229). As planned, plaintiff returned with "her quota back as a new rep," as of June 1, 2018, even though she had been on leave until June 19, 2018. (Greco Dep. 190; Pl's Dep. 108). She had the remainder of the month of June "to kind of get going and get back on her feet," before quota expectations began again for the month of July. (Greco Dep. 191).

6

When she spoke with Greco upon her return, plaintiff said to him:

I just want you to know that every day I'm exhausted by three o'clock . . . . I understand my work day is eight to five, but prior to going out on leave, the fact that you all don't have a system that allows us to enter our sales calls and they're all done at the end of the day, I was entering calls [up] to seven, sometimes up to 11 at night, if I had stuff I had to do after work that was personal and then go home and do it. I can't be doing that. I cannot do it right now. I've been released to come back to work. My work day is eight to five. I need to be able to . . . stop my work day at five o'clock. And if that means I have to come home to start entering my calls at three o'clock in the afternoon to enter two hours worth of calls[,] because that' how long it takes me to enter them, then I need to do that to wrap up my day by five.

(Pl's Dep. 227-228). According to plaintiff, Greco responded:

I can't have you do that. Other people are getting out there. They are calling on the number of calls they're supposed to make a day. There's no way you can drive out of town and be back and make the number of calls you need to make that's required of you and your requirement and cut out at three o'clock out of the field. You can't do it. You're just going to have to figure it out.

(Pl's Dep. 228).

Plaintiff asked Greco if she could receive a company car several different times, including when she returned to work in June, 2018, again in July, 2018, and again in August, 2018. (Pl's Dep. 175, 179). Greco responded that it was dependent upon plaintiff's performance, and Greco denied plaintiff's requests for a company car. (Pl's Dep. 174-178). Greco did not provide cars to senior sales executives "whose numbers weren't to company standards or expectations." (Greco Dep. 128).

In July 2018, in an effort to assist plaintiff upon her return from leave, Greco obtained approval from Tharnish for plaintiff to sell in Myrtle Beach, South Carolina, an area previously outside of Greco's territory. (Pl's Dep. Ex 21 (DE 39-2)). This expansion was designed to give

plaintiff more opportunity to meet her quota expectations. (Pl's Dep. 144). In July, 2018, plaintiff had no submitting accounts and no specimens submitted. (Hendrix Decl. ¶¶ 12 and 20).[7]

On August 9, 2018, Greco placed plaintiff on a "self-imposed action plan" or "performance improvement plan" (hereinafter "self-imposed PIP"). (Pl's Dep. 131; Hendrix Decl. ¶ 14). Greco told plaintiff that because her "numbers were not where they needed to be for July sales" she was put on the self-imposed PIP. (Pl's Verified Compl. ¶ 36). A self-imposed PIP keeps a performance issue at the district level in comparison to a PIP, which involves higher management input and is considered a more serious plan. (Def's Stmt. (DE 39-1) ¶ 27). Despite its label, Greco made the decision to place plaintiff on a self-imposed PIP, not plaintiff. (Pl's Dep. 132; Greco Dep. 278). Hendrix approved plaintiff's self-imposed PIP. (Id.).

Greco informed plaintiff on August 9, 2018, that the "expectations" for the self-imposed PIP were "2 accounts" and "28 new specimens," which are the same expectations for a one month time period as a new senior sales executive. (Pl's Dep. Ex. 20 (DE 39-2 at 96); Pl's Dep. Ex. 13 (DE 39-2); Greco Dep. 278). Greco informed plaintiff that their next call for the self-imposed PIP would be on September 10, 2018, at which point plaintiff understood they would "revisit" the self-imposed PIP. (Pl's Dep. Ex. 20 (DE 39-2 at 96); Pl's Dep. 133).

For the two month period comprising August and September, plaintiff had one submitting account and three specimens submitted. (Hendrix Decl. ¶¶ 12 and 20; Pl's Dep. 138-139).

Plaintiff and Greco did not revisit the self-imposed PIP as planned on September 10, 2018. (Pl's Dep. 140). As of September 10, 2018, the Wilmington, North Carolina, area was under a state of emergency due to Hurricane Florence, with medical offices shut down, not seeing patients,

---

[7]     Submitting accounts are those accounts that submitted specimens for testing, and they include both existing accounts and new accounts. (Hendrix Decl. ¶¶ 10 and 12). Specimens submitted are tests received from a submitting account, and they include specimens from both new and existing accounts. (Id.)

and not submitting specimens, through the beginning of October. (Id.). Plaintiff asked Greco to adjust her expectation numbers for September, but Greco responded that plaintiff's expectations numbers would not be adjusted. (Pl's Dep. 141).

Around October 3, 2018, plaintiff was on the road making "8 to 12 calls a day[,] and [her] territory is large." (Pl's Dep. 161). On that date, she was "driving up . . . I-40" and Greco texted plaintiff that he wanted to have a conference call, that "basically he's putting [plaintiff] on a PIP while [she's] sitting there driving on the road." (Id.). Plaintiff had a call that date with Greco and Hendrix, at which point Greco stated that plaintiff "was being placed on the PIP because [plaintiff] was not meeting [her] sales numbers." (Pl's Dep. 162). Greco informed plaintiff that the PIP would run from October 3, 2018, to November 3, 2018. (Pl's Verified Compl. ¶ 43). Plaintiff asked "about adjustment of goals," or to "take into account that [plaintiff's] territory had been closed, and that [plaintiff] had been out on medical leave," but Greco told plaintiff "this is, you know, the PIP, and it was what it was, basically." (Pl's Dep. 163).

To place plaintiff on the PIP, Greco obtained approval from Hendrix, Tharnish, and "HR." (Greco Dep. 100). Greco recognized that Hurricane Florence "would have affected sales down in the greater Wilmington area," and thus started plaintiff's PIP three weeks after the self-imposed PIP had completed, as a "buffer from the hurricane." (Greco Dep. 99, 138).

On October 4, 2018, Greco sent plaintiff an email attaching a PIP, with a backdated start date October 1, 2018, and an end date of October 31, 2018. (Pl's Dep. Ex. 24 (DE 39-2 at 102)). The PIP set forth 30-day "expectations" of two "newly submitting accounts" and 28 "specimens submitted,"[8] which are the same expectations that any new senior sales executive would be

---

[8] Newly submitting accounts are "like . . . the new customers" for defendant's diagnostic products, and specimens submitted are "actual specimens," or "swabs used that are sent to the lab," using one of defendant's products. (Pl's Dep. 165).

required to meet. (Greco Dep. 280; Pl's Dep. 165). It includes six additional expectations, including 50 calls/2 lunches per week, timely reports, daily updates, and follow ups with manager and clients. (Pl's Dep. Ex. 24 (DE 39-2 at 102)). It states that the PIP "will be extended for an additional 30 days if 75% of the listed expectations are met." (Pl's Dep. Ex. 24 (DE 39-2 at 102)). It states, further, that "failure to reach the sales quota and other expectations listed above will result in disciplinary action to include separation." (Pl's Dep. Ex. 24 (DE 39-2 at 102)).

On October 18, 2018, plaintiff again asked Greco when she would be getting a company car. (Greco Dep. 133; Pl's Verified Compl. ¶ 52). Greco again responded that plaintiff "didn't have numbers" to get the company car, (Greco Dep. 133), and he told her "it was based on tenure and sales numbers." (Pl's Verified Compl. ¶ 53). Plaintiff did not at any point meet the expected sales quotas for her position. (Greco Dep. 133). "Despite the fact that Plaintiff noted to Greco that the reps with the cars had a start date after her and her sales numbers had been affected by factors beyond her control (medical leave and a hurricane), Plaintiff was told again that she would not be given a company car." (Pl's Verified Compl. ¶ 54).

"Plaintiff learned that [senior sales executives] who were hired during her medical leave were scheduled to go to Advanced Sales Training at the end of October for their professional development." (Pl's Verified Compl. ¶ 44). "This opportunity was not offered to Plaintiff or to the other female rep in the district, who was hired at the same time as two male reps scheduled for this advanced training." (Pl's Verified Compl. ¶ 45). According to Hendrix, plaintiff's "sales performance did not warrant her selection for advanced training, and [Hendrix] would not have approved advanced training for" plaintiff. (Hendrix Decl. ¶ 8).

For the 30 day period of the PIP, plaintiff had one submitting account and five specimens submitted. (Pl's Dep. Ex. 26 (DE 39-2 at 104)). She thus did not meet those listed expectations

10

in the PIP.  (Id.).  Of the six additional expectations, plaintiff met only four: timely reports, daily updates, and follow ups with manager and clients.  (Id.).  She did not meet expectations for calls per week or lunches per week.  (Id.).  In sum, plaintiff met only four of eight expectations in the PIP, or 50% of the listed expectations, not the required 75% of the listed expectations.  (Id.).[9]

On October 29, 2018, Greco recommended to Hendrix that plaintiff be terminated, "as it was clear that she would not meet the expectations of the PIP."  (Hendrix Decl. ¶ 21; Greco Dep. 100).[10]  Hendrix "concurred with the recommendation and contacted [Tharnish] for approval." (Hendrix Decl. ¶ 21).  "After reviewing the facts, discussing the issue, and gathering input from the salesforce Human Resources, [Tharnish] made the decision to terminate [plaintiff] for poor performance."  (Id.; see Tharnish Decl. ¶ 5; Greco Dep. 199).

On October 29, 2018, plaintiff called "HR" and spoke to "someone" about the need for leave for a second surgery in November, 2018, and they "said they would send [her] the paperwork."  (Pl's Dep. 197).  On October 31, 2018, plaintiff did not have the paperwork, so she called back and talked to "someone" and "they said they would get [plaintiff] the paperwork." (Pl's Dep. 197-198).  Jodi Kovacs ("Kovacs"), a benefit and leave specialist "in HR" for defendant, was aware of a request from plaintiff for medical leave for a surgery to take place in November, 2018.  (Greco Dep. 209-211).

At a conference call on November 2, 2018, plaintiff was informed of her termination.  (Pl's Dep. 180).  Individuals on the call included Greco, Hendrix, maybe Tharnish, and a person from "HR," who may have been Amanda Pavuk ("Pavuk"), a human resource representative.  (Pl's Dep.

---

[9]  Plaintiff asserts that she met an "average of 79%" for the "eight measured goals" in the PIP.  (Pl's Verified Compl. ¶ 64).  This is not, however, the relevant standard set forth in the PIP. (See Pl's Dep. Ex. 24 (DE 39-2 at 102)).

[10]  Plaintiff cites to testimony by Greco that "after the PIP is when I would have decided to terminate [plaintiff]." (Greco Dep. 139).  However, he testified, "I don't know if that's the actual date of termination, but that was the PIP end date," and he stated "I don't have the exact date.  I don't know."  (Greco Dep. 140-141).

180-181).  They informed plaintiff that she had been terminated because plaintiff "didn't meet the expectations of the PIP."  (Pl's Dep. 182).

Greco, Hendrix, and Tharnish were not aware of plaintiff's October 31, 2018, request for medical leave prior to terminating plaintiff.  (Greco Dep. 210; Hendrix Decl. ¶ 23; Tharnish Decl. ¶ 6).  Shortly after her termination call, plaintiff received paperwork via email for her November leave request: "an hour later, like a slap in the face, there came [her] paperwork [she] had been requesting all week."  (Pl's Dep. 198; <u>see</u> Verified Compl. ¶ 61).

After plaintiff's termination, defendant did not replace plaintiff with a senior sales executive living in the Wilmington, North Carolina area.  (Hendrix Decl. ¶ 24).  Sanchez, a senior sales executive who lived in Fayetteville, could cover that area of the state.  (<u>Id.</u>).

<b>COURT'S DISCUSSION</b>

A.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial."  <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).  Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (holding that a factual dispute

is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B.    Analysis

    1.    Wrongful Discharge Under ADA

13

Plaintiff claims that defendant discriminated against plaintiff by terminating her because of her status as a qualified individual with a disability, her history of disability, or being regarded as having a disability, in violation of the ADA. (Compl. ¶ 101).

In a "discharge case brought under the ADA, a plaintiff must prove by a preponderance of the evidence that (1) she was in the protected class; (2) she was discharged; (3) at the time of the discharge, she was performing her job at a level that met her employer's legitimate expectations; and (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995); see Reynolds v. Am. Nat. Red Cross, 701 F.3d 143, 150 (4th Cir. 2012).

"Although on summary judgment an employer is free to assert that the job expectation prong has not been met," an employee may "counter[] this assertion with evidence that demonstrates (or at least creates a question of fact) that the proffered 'expectation' is not, in fact, legitimate at all." Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 517 (4th Cir. 2006). A plaintiff may show, for example, that an employer's "expectations were a 'sham designed to hide the employer's discriminatory purpose,' or were somehow not "legitimate." Id. (quoting Brummett v. Lee Enterprises, Inc., 284 F.3d 742, 745 (7th Cir.2002)).

In considering whether an employee was meeting her employer's legitimate expectations, "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." Hawkins v. PepsiCo, Inc., 203 F.3d 274, 280 (4th Cir. 2000). The court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998) (quoting Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th

14

Cir.1997)). "[I]t is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." Id.

Thus, an "employee must present evidence reasonably calling into question the honesty of [her] employer's belief" in its evaluation of a plaintiff's performance. Id. (citing Giannopoulos, 109 F.3d at 411). For example, a plaintiff may show that an employer's evaluation "could be discredited . . . as inconsistent and contradictory." Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 575 (4th Cir. 2015). But, an "employee's mere demonstration that [her] employer's belief may be incorrect is not sufficient to prove discrimination." DeJarnette, 133 F.3d at 299.

In this case, plaintiff has not demonstrated a genuine issue of fact that she was meeting defendant's legitimate expectations at the time of discharge. It is undisputed that, on March 12, 2018, defendant informed plaintiff of its expectations of plaintiff as a senior sales executive, including: 1) obtaining a minimum average of two new submitting accounts (also referenced as "submitting clients") per month, for a total of six new submitting accounts by the end of three months; and 2) obtaining a minimum average of 28 specimens each month, for a total of 168 specimens at the end of three months. (Def's Stmt. ¶ 14; Pl's Dep. Ex. 13 (DE 39-2 at 93); Hendrix Decl. ¶ 10). These expectations were legitimate because they were applicable to all senior sales executives, and they were communicated clearly in writing to plaintiff. (Id.). Defendant kept performance records of all senior sales executives "in the regular course of its business due to its need to track sales and employee performance." (Hendrix Decl. ¶ 12). In addition, it is undisputed that plaintiff did not meet these expectations in the month and quarter preceding her termination, nor in any other month of her tenure. (Hendrix Decl. ¶¶ 12, 20; Pl's Dep. 170-171).

Furthermore, defendant's performance expectations were reiterated in the self-imposed PIP and the PIP, which provided plaintiff an opportunity to continue in employment by completing

15

only a subset of the performance expectations communicated to plaintiff at the start of her employment. (See Pate Dep. Exs. 20, 24; Greco Dep. 139, 277-278; Hendrix Decl. ¶ 18; Greco Dep. Ex. 3). Once the PIP expectations were communicated to plaintiff, they were applied according to their terms and in accordance with the quotas specified. (Hendrix Decl. ¶¶ 12, 20; Pl's Dep. 170-171, 182; Pl's Dep. Ex. 26 (DE 39-2 at 104)). In sum, by objective measures, plaintiff was not meeting her employer's legitimate expectations at the time of discharge.

Plaintiff suggests that defendant's expectations at the time of her discharge were not legitimate because defendant did not sufficiently take into account several factors, including: 1) plaintiff's period of disability leave for breast cancer surgery between May 5, 2018, to June 19, 2018; 2) plaintiff's medical condition and work conditions outside of that period of disability leave; 3) a lack of support, training, and company car; and 4) Hurricane Florence. As an initial matter, none of these factors, on their face, create a genuine issue of material fact as to the legitimacy of defendant's performance expectations at the time of discharge. This is because they do not show that defendant fabricated its expectations for purposes of terminating plaintiff, that defendant did not honestly believe plaintiff had not met the expectations, or that the expectations were inconsistent and contradictory. See DeJarnette, 133 F.3d at 299; Jacobs, 780 F.3d at 575; see also Brummett, 284 F.3d at 745 ("[W]e will not second-guess an employer's policies that are facially legitimate.").

While plaintiff suggests that defendant did not sufficiently reduce its performance expectations for plaintiff to account for her circumstances, this does not undermine the legitimacy of the expectations that were communicated to plaintiff and used for purposes of evaluating plaintiff's performance for discharge. Because the court does not sit as a super-personnel department, it is not the court's province for purposes of evaluating this element of the claim, to

16

second guess whether defendant's expectations were sufficiently responsive, realistic, wise, or fair. See DeJarnette, 133 F.3d at 299; see also Mintz v. Caterpillar Inc., 788 F.3d 673, 680 (7th Cir. 2015) (noting that whether a performance standard imposed "was a realistic expectation is not for us to decide"); Contreras v. Suncast Corp., 237 F.3d 756, 760 (7th Cir. 2001) ("[I]t is no business of a court in a discrimination case to decide whether an employer demands too much of his workers . . . so long as the employer's employment expectations are in good faith, without fraud or deceit"); Ruff v. Target Stores, Inc., 226 F. App'x 294, 302 (4th Cir. 2007) ("[T]he relevant question is whether [defendant] believed she was doing a good job, not whether someone more familiar with her situation would have thought so.") (emphasis added).[11]

In any event, plaintiff has not demonstrated that defendant's expectations preceding plaintiff's discharge were so unreasonable or insufficiently responsive to raise a genuine issue of material fact as to their legitimacy. With respect to accounting for plaintiff's first period of disability leave, it is undisputed that defendant provided plaintiff the month of June 2018 "to kind of get going and get back on her feet," before quota expectations began again for the month of July. (Greco Dep. 191). Defendant thus did not base its discharge on any assessment of plaintiff's performance during the period of disability.

With respect to plaintiff's medical condition and work conditions outside of her period of leave, plaintiff suggests that defendant's expectations were too high in July 2018 and beyond due to plaintiff's need to get back to speed after her leave, and to account for a move to open territories in Greco's district. Plaintiff contends, for example, that defendant should not have expected plaintiff to close any accounts "until at least the end of July or first half of August." (Pl's Stmt.

---

[11]      The court leaves for discussion further below, in the separate context of plaintiff's failure to accommodate claim, whether plaintiff requested accommodations for a disability, and whether defendant sufficiently addressed those requests, if any.

(DE 49) ¶ 27).  When plaintiff started employment with defendant, however, she was told on March 12, 2018, after completing an initial phase of training, that she would have until April 1, 2018, before quota expectations began.  (Def's Stmt. (DE 39-1) ¶¶ 1, 14;  Def's Stmt. ¶ 14; Pl's Dep. Ex. 13 (DE 39-2 at 93); Hendrix Decl. ¶ 10).  Providing plaintiff a similar amount of time, upon her return to work on June 19, 2018, does not render defendant's expectations illegitimate. Moreover, while plaintiff claims other employees were able to gain a foothold in her former exclusive territory, Greco allowed plaintiff to expand in Myrtle Beach, and viewed open territories as a benefit to all sales employees.  (Pl's Dep. Ex. 21 (DE 39-2); Greco Dep. 27-29).

Plaintiff also suggests defendant should have taken into account plaintiff's request to enter sales calls starting at three o'clock each day.  (Pl's Dep. 227-228). Likewise, plaintiff suggests that defendant should not have expected full performance from plaintiff without advanced training, on the ground support, and a company car. (Pl's Stmt. (DE 49) ¶ 25).  Plaintiff does not forecast, however, any particular reduced level of performance she could have met if she had been provided these additional support measures.  Further, defendant's expectations communicated to plaintiff initially were not contingent upon such additional measures, and defendant articulated business reasons for not providing them to plaintiff. (Pl's Dep. 174-178; 228; Greco Dep. 133; Hendrix Decl. ¶ 8).

Plaintiff also suggests that defendant should have taken into account shutdowns caused by Hurricane Florence in setting performance expectations for plaintiff. As an initial matter, however, Greco did recognize that Hurricane Florence "would have affected sales down in the greater Wilmington area," and thus started plaintiff's PIP three weeks after the self-imposed PIP had completed, as a "buffer from the hurricane."  (Greco Dep. 99, 138).  While plaintiff suggests defendant should have given plaintiff even more leeway, there is no evidence that defendant

18

viewed Hurricane Florence as so much of an impediment to sales as plaintiff now asserts. See King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir.2003) ("It is the perception of the decision maker which is relevant."). Indeed, plaintiff describes driving for work on the interstate over a large territory on October 3, 2018, the day she had a conference call about her PIP. (Pl's Dep. 161). From Greco's perspective, plaintiff was able to travel to the Raleigh area, or anywhere in his district, during the time Hurricane Florence impacted Wilmington. (Greco Dep. 42, 27-29). Moreover, Hurricane Florence had no impact on the period of plaintiff's self-imposed PIP, in August, through September 10, 2018, but plaintiff's numbers during that period still did not meet defendant's expectations. (Hendrix Decl. ¶¶ 12, 20; Pl's Dep. 138-139).

In sum, factors cited by plaintiff do not serve individually or together to discredit defendant's performance expectations during the critical time periods of evaluation, particularly during the period of the self-imposed PIP and the PIP. By the time period August 1 to September 10, there is no genuine issue of material fact that defendant legitimately expected plaintiff to meet performance standards set at the start of her employment. Likewise, by October 1 to October 31, defendant again could legitimately expect plaintiff to meet those standards. Because plaintiff did not, plaintiff fails to demonstrate a genuine issue of fact as to her prima facie case for wrongful discharge under the ADA.

Therefore, plaintiff's ADA wrongful discharge claim fails as a matter of law.

2.      Failure to Accommodate under ADA

Plaintiff claims that defendant failed to provide plaintiff "reasonable accommodations for her disability," including in response to plaintiff's requests for "unpaid leave and associated modifications to any of the alleged performance standards." (Pl's Compl. ¶¶ 88, 92-93).

"To establish a prima facie case for failure to accommodate, [a plaintiff] must show: (1) that she was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of her disability; (3) that with reasonable accommodation she could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." Jacobs, 780 F.3d at 579.

"[I]n any determination of a position's essential functions, consideration shall be given to the employer's judgment." Elledge v. Lowe's Home Centers, LLC, 979 F.3d 1004, 1009 (4th Cir. 2020). "The employer's business judgment—that is, the judgment of the entity that defined the employee's role in the first place—commences the analysis." Id. "While the ADA identifies a position's written job description as relevant to the employer's judgment on this question, 42 U.S.C. § 12111(8), it does not posit that description as dispositive." Id. "Rather, a court performing the essential functions inquiry must consult the full range of evidence bearing on the employer's judgment, including the testimony of senior officials and those familiar with the daily requirements of the job." Id.

In addition, before a plaintiff can establish her employer refused to provide reasonable accommodation in violation of the ADA, she "first must have, at minimum, communicated to [the employer] a wish for accommodation of [her] disability." Parkinson v. Anne Arundel Med. Ctr., 79 F. App'x 602, 604 (4th Cir. 2003) (citing Ballard v. Rubin, 284 F.3d 957, 960–962 (8th Cir.2002)). "Of course, a request for accommodation need not, in all cases, 'be in writing, be made by the employee, or formally invoke the magic words reasonable accommodation.'" Id. (quoting Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3d Cir.1999). But a plaintiff "must have reasonably believed, at least, that [her] actions and statements made clear to [the employer] that [she] wanted assistance for [her] disability." Id.

20

"Although employers must provide reasonable accommodation to assist disabled employees in performing the essential functions of their jobs, employers do not need to change a job's essential functions or split them across multiple employees." Elledge, 979 F.3d at 1013. "[T]he ADA's reasonable accommodation standard does not require an employer to abandon a legitimate and non-discriminatory company policy." E.E.O.C. v. Sara Lee Corp., 237 F.3d 349, 353–54 (4th Cir. 2001). In addition, a plaintiff must demonstrate the reasonable accommodation "would have enabled [her] to perform the essential functions of [her] position." Wilson v. Dollar Gen. Corp., 717 F.3d 337, 346 (4th Cir. 2013).

As a threshold matter, plaintiff's complaint and brief identify with varying specificity what accommodations plaintiff requested and the timing and manner of the requests. One specific request identified by plaintiff is her inquiry to "HR" in October 2018 for a period of unpaid leave in November 2018. (Pl's Dep. 197). The record reflects that plaintiff called "HR" and spoke to "someone" about her need to take leave for a second "reconstruction" surgery to take place in November, 2018, and they "said they would send [her] the paperwork." (Id.). Jodi Kovacs ("Kovacs"), a benefit and leave specialist "in HR" for defendant, was aware of this request. (Greco Dep. 209-211). Shortly after plaintiff's termination call, on November 2, 2018, plaintiff received paperwork via email for this leave request. (Pl's Dep. 198; see Verified Compl. ¶ 61). This evidence, however, is insufficient to show that plaintiff thereby made a request for a "disability" accommodation or that defendant refused plaintiff's accommodation request. Parkinson, 79 F. App'x at 604.

In addition, the evidence is insufficient to show that, with the requested accommodation, plaintiff would have been able to perform the essential functions of the position. Because the request was for a leave period in November 2018, the requested accommodation, regardless of its

characterization under the law, could not have assisted plaintiff with performing the essential functions of her position before plaintiff was terminated on November 2, 2018. Further, plaintiff has not shown that the requested accommodation would have enabled her to perform the essential functions of her position if she had continued in her position. See Wilson, 717 F.3d at 346. Accordingly, plaintiff's asserted request for accommodation in October 2018 does not support a viable claim for failure to accommodate under the ADA.

Apart from the October 2018 leave request, and apart from plaintiff's first leave request that was granted, plaintiff has not identified in briefing any specific time or manner in which she requested an accommodation for a disability. Plaintiff suggests through her deposition testimony that she requested a modification in her work hours upon return from leave in June 2018, and that she requested a modification in her quotas or expectations around the same time, up through the period of her PIPs. Plaintiff has not demonstrated, however, that in these respects plaintiff "communicated to [defendant] a wish for accommodation of [a] disability." Parkinson, 79 F. App'x at 604. The evidence does not reflect that plaintiff "reasonably believed . . . that [her] actions and statements made clear to [the employer] that [she] wanted assistance for [her] disability." Id.

In particular, it is undisputed that plaintiff returned to work from her first period of leave on June 19, 2018, with no restrictions, and with "her quota back as a new rep." (Pl's Dep. 108, 229; Greco Dep. 190). In this context, plaintiff's statement to Greco that "I just want you to know that every day I'm exhausted by three o'clock," (Pl's Dep. 227), is not a qualifying request for accommodation. Nor is plaintiff's alleged statement to Greco that "her sales numbers had been affected by factor beyond her control (medical leave . . .)," (Pl's Verified Compl. ¶ 54), sufficient to qualify as a request for accommodation.

In any event, plaintiff has not demonstrated that the asserted accommodations would have enabled her to "perform the essential functions of the position" or enhanced such functioning. Jacobs, 780 F.3d at 579. While there is no formal job description in the record, Greco's post-training email and plaintiff's PIPs set forth minimum requirements for maintaining good standing in the position. (Pl's Dep. Ex. 24 (DE 39-2 at 102); Pl's Dep. Ex. 13 (DE 39-2 at 93)). There is no reasonable basis to infer that allowing plaintiff to return from the field at three o'clock, or reducing sales quotas, would enable plaintiff to perform such essential functions of her job. To the contrary, such measures by their nature would have made it more difficult to perform to the level expected. See Elledge, 979 F.3d at 1013 (noting that to reasonably accommodate "employers do not need to change a job's essential functions").

Plaintiff cites Rorrer v. City of Stow, 743 F.3d 1025, 1040 (6th Cir. 2014), for the proposition that "failure to 'discuss a reasonable accommodation in a meeting in which the employer takes an adverse employment action' against a disabled employee is evidence of bad faith." (Pl's Mem. (DE 48) at 7). Plaintiff suggests that this proposition is applicable to calls or conferences between plaintiff and defendant about her PIP performance. This proposition, however, is inapplicable under the circumstances because there is no evidence that plaintiff was disabled, or regarded as disabled, at the time of any calls of conferences about her PIP performance. Plaintiff had returned from leave on June 19, 2018, without any restrictions. (Pl's Dep. 229). Although plaintiff suggests she communicated in October 2018 a need for accommodation due to the fact that she previously "had been out on medical leave," (Pl's Dep. 163), she did not communicate any present disability in October 2018 when her PIP performance was being considered. Rorrer thus is constructively distinguishable on this basis, where in that case the "parties [did] not dispute, that the [defendant] relied on [plaintiff's] disability in making an

23

In any event, plaintiff has not demonstrated that the asserted accommodations would have enabled her to "perform the essential functions of the position" or enhanced such functioning. Jacobs, 780 F.3d at 579. While there is no formal job description in the record, Greco's post-training email and plaintiff's PIPs set forth minimum requirements for maintaining good standing in the position. (Pl's Dep. Ex. 24 (DE 39-2 at 102); Pl's Dep. Ex. 13 (DE 39-2 at 93)). There is no reasonable basis to infer that allowing plaintiff to return from the field at three o'clock, or reducing sales quotas, would enable plaintiff to perform such essential functions of her job. To the contrary, such measures by their nature would have made it more difficult to perform to the level expected. See Elledge, 979 F.3d at 1013 (noting that to reasonably accommodate "employers do not need to change a job's essential functions").

Plaintiff cites Rorrer v. City of Stow, 743 F.3d 1025, 1040 (6th Cir. 2014), for the proposition that "failure to 'discuss a reasonable accommodation in a meeting in which the employer takes an adverse employment action' against a disabled employee is evidence of bad faith." (Pl's Mem. (DE 48) at 7). Plaintiff suggests that this proposition is applicable to calls or conferences between plaintiff and defendant about her PIP performance. This proposition, however, is inapplicable under the circumstances because there is no evidence that plaintiff was disabled, or regarded as disabled, at the time of any calls of conferences about her PIP performance. Plaintiff had returned from leave on June 19, 2018, without any restrictions. (Pl's Dep. 229). Although plaintiff suggests she communicated in October 2018 a need for accommodation due to the fact that she previously "had been out on medical leave," (Pl's Dep. 163), she did not communicate any present disability in October 2018 when her PIP performance was being considered. Rorrer thus is constructively distinguishable on this basis, where in that case the "parties [did] not dispute, that the [defendant] relied on [plaintiff's] disability in making an

adverse employment decision against him," which was an ongoing and unequivocal loss of vision in one eye. Rorrer, 743 F.3d at 1041.

In sum, plaintiff fails to demonstrate a genuine issue of fact on her failure to accommodate claim under the ADA.

        3.        Sex Discrimination under Title VII

Plaintiff claims that defendant discriminated against plaintiff on the basis of her sex, in violation of Title VII, through employment actions including "account assignment, unequal wages and benefit compensation, [and] performance review." (Compl. ¶ 105).

Similar to the ADA, "the elements of a prima facie case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Coleman v. Maryland Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010); see Lettieri v. Equant Inc., 478 F.3d 640, 646 (4th Cir. 2007).

A threshold issue presented by plaintiff's Title VII claim is whether the alleged employment actions of which plaintiff complains qualify as adverse employment actions for purposes a prima facie case. "An adverse employment action is a discriminatory act which adversely affects the terms, conditions, or benefits of the plaintiff's employment." James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004). "[A]bsent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." Id. at 376. "Moreover, reprimands and poor performance evaluations . . . are much less likely to involve adverse employment actions than the transfers, discharges, or failures to promote whose impact

on the terms and conditions of employment is immediate and apparent." Adams v. Anne Arundel Cty. Pub. Sch., 789 F.3d 422, 431 (4th Cir. 2015). To be actionable, a plaintiff must "link such matters . . . to some material change in the conditions of [her] employment." Id.

Here, plaintiff's assertion of discrimination in "account assignment" and "performance review" (Compl. ¶ 105) are not qualifying adverse employment actions. Plaintiff raises similar assertions in her deposition testimony and statement of facts: 1) after her return from leave, "Greco cancelled the visit on Plaintiff and did not attend the lunches" that had been scheduled prior to leave; she "never received any more ride-alongs . . . never saw Greco's face after April 24" (Pl's Stmt. (DE 49) ¶ 45); 2) Greco "put [plaintiff] on performance improvement plans but gave [her] no hands-on help as the other reps were receiving" (id.); 3) Greco did not follow up with plaintiff after both PIPs (id.); 4) plaintiff did not receive advanced training (Pl's Dep. 203); 5) she did not receive desirable account assignments as part of the move to open territories (Pl's Stmt. (DE 49) ¶ 46). Because these actions did not come with a "decrease in compensation, job title, level of responsibility, or opportunity for promotion," and they did not constitute a material change in the conditions of employment, they are not adverse employment actions actionable under Title VII. James, 368 F.3d at 375.[12]

With respect to unequal wages and benefit compensation, plaintiff asserts that she did not receive a company car unlike all of her male counterparts. (Pl's Stmt. (DE 49) ¶ 41). Because plaintiff suggests that provision of a company car impacts plaintiff's out-of-pocket expenses for travel, (see Pl's Dep. 50-51), the court presumes for purposes of the instant analysis that not receiving a company car is an adverse employment action.

---

[12]     Plaintiff suggests in deposition testimony that some of the same actions constitute discrimination on the basis of disability in violation of the ADA. (Pl's Dep. 225-234). To the extent plaintiff asserts such a claim under the ADA, which is not asserted in the complaint, it fails on the same basis as plaintiff's Title VII claim for the reasons stated in the text above.

Plaintiff's claim based upon provision of a company car, however, fails on the second element of the prima facie case. Plaintiff asked Greco if she could receive a company car several different times, including when she returned to work in June, 2018, again in July, 2018, August, 2018, and October, 2018. (Pl's Dep. 174-175, 179). Plaintiff was not meeting the expected sales quotas for her position at any of those times. (Hendrix Decl. ¶¶ 12, 20; Pl's Dep. 170-171; Greco Dep. 133). Therefore, plaintiff has not demonstrated a genuine issue of material fact that she was performing her job "at a level that met her employer's legitimate expectations" at any point in time that she requested and was denied a company car. Lettieri, 478 F.3d at 646.

Plaintiff again suggests that defendant's expectations of plaintiff's performance was not legitimate because "her sales numbers had been affected by factors beyond her control (medical leave and a hurricane)." (Pl's Verified Compl. ¶ 54). As discussed previously, however, plaintiff's challenges to the legitimacy of defendant's expectations, based upon her medical leave and the hurricane, fail as a matter of law. Plaintiff has not brought forth evidence tending to show that defendant fabricated its expectations at the time it denied plaintiff a company car, that defendant did not honestly believe plaintiff had not met the expectations, or that the expectations were inconsistent and contradictory. See DeJarnette, 133 F.3d at 299; Jacobs, 780 F.3d at 575; Brummett, 284 F.3d at 745.

Where plaintiff's Title VII claim based on provision of a company car fails on the second element of the prima facie case, the court does not reach the element of "different treatment from similarly situated employees outside the protected class." Coleman, 626 F.3d at 190. Nor does the court address, in evaluating the Title VII claim, whether plaintiff has rebutted defendant's gender-neutral reasons for not giving plaintiff a company car. The court addresses these issues further in discussing plaintiff's Equal Pay Act claim.

26

In sum, plaintiff's Title VII sex discrimination claim fails as a matter of law.[13]

4.      Retaliation under Title VII and ADA

Plaintiff claims that defendant retaliated against her by discharging her and taking other adverse employment actions against her after she engaged in protected activity under Title VII and the ADA.  In her brief in opposition to summary judgment, plaintiff suggests she engaged in protected activity by requesting leave a second time in October 2018, by asking that her PIP take into consideration her time off and health issues due to breast cancer, and by making multiple requests for a company car.

"To establish a prima facie case of retaliation, [a plaintiff is] obliged to show that (1) [she] engaged in a protected activity; (2) [defendant] took an adverse employment action against [her]; and (3) a causal connection existed between the protected activity and the asserted adverse action." Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 650 (4th Cir. 2002).  "The employer then has the burden to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions."  Jacobs, 780 F.3d at 578.  "The burden then shifts back to the plaintiff to show that the proffered reason is pretext."  Id.

A "request for an accommodation" may be a protected activity under the ADA.  Haulbrook v. Michelin N. Am., 252 F.3d 696, 706 (4th Cir. 2001).  In addition, "protected oppositional activities may include . . . complaints about suspected violations."  E.E.O.C. v. Navy Fed. Credit Union, 424 F.3d 397, 406 (4th Cir. 2005).  "[A] plaintiff is not required to prove the conduct [she] opposed was actually an ADA violation," or a Title VII violation, but rather only that she "had a

---

[13]      Plaintiff suggests in her brief that she was also terminated on the basis of her sex, in violation of Title VII. (Pl's Br. (DE 48) at 12). Plaintiff, however, does not assert termination as a basis for her Title VII claim in her complaint. (See Compl. ¶ 105).  In any event, plaintiff's Title VII claim premised upon wrongful termination fails on the same basis as her ADA claim premised upon wrongful termination.  Plaintiff fails to demonstrate a genuine issue of material fact that she was meeting her employer's legitimate expectations at that time.

good faith belief the conduct violated the ADA" or Title VII. Reynolds v. Am. Nat. Red Cross, 701 F.3d 143, 154 (4th Cir. 2012); Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 272 (4th Cir. 2015) (Title VII). However, a complaining employee must have "informed [the employer] that her complaints were based on . . . discrimination," and the employer must be "aware that the employee's complaint is based on . . . prohibited discrimination." Richardson v. Richland Cty. Sch. Dist., 52 F. App'x 615, 617 (4th Cir. 2002).

To establish a causal connection for purposes of the prima facie case, a plaintiff must show that "the relevant decisionmaker" was aware that the plaintiff had engaged in a protected activity. Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998). "[T]he employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case." Id.; see Conrad v. CSX Transportation, Inc., 824 F.3d 103, 107 (4th Cir. 2016).

Beginning with plaintiff's requests for a company car, plaintiff fails to establish a genuine issue of material fact that these were protected activities. There is no evidence that, when requesting a company car, plaintiff complained of discrimination based upon sex or disability. Rather, plaintiff testified she "really didn't realize it was more of a sexual discrimination until after talking to Christina [Sanchez] on October 16 and finding out I was the only one who hadn't received a company car, and that others were going to training that we weren't going to." (Pl's Dep. 223-224).

With respect to ADA retaliation, the court determined previously that, apart from her first request for leave, plaintiff did not make any qualifying requests for accommodation for a disability. In addition, regarding her second request for leave, plaintiff has not demonstrated a genuine issue of material fact that "the relevant decisionmaker" was aware that the plaintiff had engaged in a

28

protected activity. <u>Dowe</u>, 145 F.3d at 657. While Kovacs was aware of plaintiff's second request for leave (Greco Dep. 209-211), there is no evidence that other individuals in "salesforce Human Resources" who were involved in plaintiff's termination were aware of the request. (Hendrix Decl. ¶ 21). Moreover, the fact that plaintiff received paperwork for her second leave request after her termination, (<u>see</u> Pl's Dep. 198), further belies any inference that those involved in the leave request were involved in plaintiff's termination.

In any event, plaintiff has not demonstrated a genuine issue of fact that the legitimate reason for her discharge, deficient performance, was a pretext for unlawful retaliation. For the reasons discussed previously with respect to plaintiff's ADA discharge claim, it is undisputed that plaintiff did not meet the performance quotas set in her PIP, and there is no genuine issue of material fact that those performance quotas were defendant's legitimate expectations.

Plaintiff suggests that the proximity in time between her second leave request and her termination demonstrates pretext. In this context, however, where the reason for plaintiff's discharge is grounded solely in her deficient performance, and where the standard of performance is grounded in a PIP that was put in place prior to her second leave request, mere proximity in time is not enough to create a genuine issue of fact of pretext.

In sum, plaintiff's claim for retaliation under the ADA and Title VII fails as a matter of law.

     5.    Equal Pay Act

Plaintiff claims that she was paid lower compensation benefits than male employees, particularly in being denied access to a company car, in violation of the Equal Pay Act.

Under the Equal Pay Act, no employer "shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages

to employees of the opposite sex . . . except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1).

"In order to establish a prima facie case under the Equal Pay Act, the plaintiff must show that she receives less pay than a male coemployee performing work substantially equal in skill, effort, and responsibility under similar working conditions." Houck v. Virginia Polytechnic Inst. & State Univ., 10 F.3d 204, 206 (4th Cir. 1993). "After the plaintiff establishes a prima facie Equal Pay Act case, the burden shifts to the employer to prove, by a preponderance of the evidence, that the pay differential is justified by one of the four statutory exemptions." Id. at 207. Under these exemptions, "differences based on experience, training, or ability would also be excluded." Strag v. Bd. of Trustees, Craven Cmty. Coll., 55 F.3d 943, 949 (4th Cir. 1995). "In the absence of . . . evidence to rebut [a defendant's] gender-neutral justifications for the pay differential, summary judgment [is] certainly warranted." Id. at 951.

For purposes of the instant motion, defendant does not dispute that plaintiff has established a prima facie case. Defendant, however, has brought forth evidence of multiple gender-neutral justifications for the difference in treatment, which plaintiff fails to rebut. Greco testified, for example, "you will not be getting a company car right away," and "it usually takes if anything, up to six months but also it matters [sic] your numbers." (Greco Dep. 109). He also testified: "It depended on their numbers and also . . . the territory - - so for instance, if I had a rep, let's say in Virginia Beach and the rep in Virginia Beach quit but there was somebody else in Virginia Beach and it was right there. Then I have a car sitting at somebody's house. I'm just going to give them the car." (Greco Dep. 109-110). In addition, Greco testified he had to "get approval for somebody to get a car," and "if a rep's on an action plan where in other words, they could be terminated . . .

then I'm not going to get approved to get them a company car." (Greco Dep. 111). "People whose numbers didn't warrant a car," he testified, were those "whose numbers weren't to company standards or expectations." (Greco Dep. 127-128). Greco consistently responded to plaintiff's requests that her performance numbers did not justify a company car. (Pl's Dep. 174-178; Greco Dep. 133; Pl's Verified Compl. ¶ 53).

In addition, both female and male employees under Greco's management received company cars, as follows:

| Name | Sex | Date of Car |
|---|---|---|
| Babb, Edward L. | Male | 3/16/18 |
| Bidelspach, Tanner T. | Male | 4/4/16 |
| Brooks, Jessica | Female | 11/10/16 |
| Dorin, Max | Male | 12/29/17 |
| Hardy, Cathryn | Female | 12/7/17 |
| Hicks, Lauren M. | Female | 11/6/17 |
| Mathews, Robert C. | Male | 8/3/18 |
| Ruff, Taylor B. | Female | 5/25/18 |
| Sanchez, Christina | Female | 10/9/18 |
| Shaw, Ryan A. | Male | 11/10/16 |
| Starcher, Christine R. | Female | 8/4/17 |
| Taylor, Allison B. | Female | 4/18/17 |
| Treherne., Robert M. | Male | 6/21/18 |
| Williams, Ryan H. | Male | 8/3/18 |
| Williamson, Weston K. | Male | 9/4/18 |

(Hendrix Decl. ¶ 27). In addition, none of the eight listed male employees who received company cars had the same combination of short tenure, deficient performance, and location as plaintiff. (See Hendrix Decl. ¶ 12 (listing date of hire, performance numbers, and disciplinary actions)). Two male recipients who received cars shortly after their hire, Robert Matthews ("Matthews") and Weston Williamson ("Williamson"), had substantially better performance than plaintiff in their first two months of employment. (See id.; see also Greco Dep. 125 (stating Matthews "was one of my top reps"). At the same time, another male employee, Joe Muoio, who resigned in July 2018, despite having some prior months with better performance than plaintiff, did not receive a

company car.  (Id.). Only one of the male employees listed as receiving a car, Ryan Williams ("Williams"), was placed on a PIP in September 2018, and he resigned in October 2018.  (Id.). Williams, however, was provided a company car on August 3, 2018, and in the preceding month he had one submitting account and three specimens submitted, which was better than plaintiff's numbers for July.  (Id.).

In any event, individual comparisons between employees both male and female who received cars, do not create a genuine issue of material fact as to defendant's gender neutral justifications for providing company cars, particularly given the variety of gender-neutral factors and the overall pattern of male and female recipients. Cf. Strag, 55 F.3d at 948 (noting that "isolated incidents or random comparisons demonstrating disparities in treatment may be insufficient to draw a prima facie inference of discrimination without additional evidence that the alleged phenomenon of inequality also exists with respect to the entire relevant group of employees").

Plaintiff suggests that defendant's gender neutral justifications are rebutted by the fact that "[t]he online job listing for a senior sales executive lists company car, simply and plainly company car," with "no restrictions to it."  (Pl's Dep. 51).  "It doesn't say performance-based.  It doesn't say . . . tenure-based company car."  (Id.).  These alleged statements in the online job listing, however, which is not itself in the record, do not rebut the undisputed gender neutral justifications Greco offered for withholding a car from plaintiff, based upon performance, tenure, and location. In addition, plaintiff testified that Greco gave her "some qualifications for the car," and she and Greco discussed mileage reimbursement for plaintiff's use of her own car, during the interview for the position.  (Pl's Dep. 50, 52).

Plaintiff also suggests that defendant's gender neutral justifications are rebutted by the fact that Greco would tell men who received company cars to "keep it quiet" and "if they talked about receiving their cars, the cars would be taken back." (Greco. Dep. 127; see Williamson Aff. ¶ 11). Again, however, this fact does not rebut or undermine the legitimacy of the gender-neutral criteria regarding provision of a company car, particularly for plaintiff the issue of deficient performance. (Greco Dep. 109-11, 127-128, 133; Pl's Verified Compl. ¶ 53).

In sum, because there is no genuine issue of material fact regarding defendant's gender-neutral criteria for providing company cars, plaintiff's claim under the Equal Pay Act fails as a matter of law.

6.      North Carolina Equal Employment Practices Act

Plaintiff asserts a claim for wrongful discharge in violation of the public policy of North Carolina, particularly the North Carolina Equal Employment Practices Act, N.C. Gen. Stat. § 143-422.1. However, plaintiff concedes in opposition to summary judgment that this claim is "dependent upon the ADA, ADA-Accommodation or Title VII claims." (Pl's Mem. (DE 48) at 15). Therefore, where plaintiff's federal claims fail as a matter of law, plaintiff's Equal Employment Practices Act claim also must be dismissed.

**CONCLUSION**

Based on the foregoing, defendant's motion for summary judgment (DE 39) is GRANTED. The clerk is DIRECTED to close this case.

SO ORDERED, this the 15th day of March, 2021.


_____
LOUISE W. FLANAGAN
United States District Judge

33